Howard S. Schwartz

v.

Fairfax County
Board of Supervisors et al.

August 2, 2000

Case No. (Chancery) 143876

BY JUDGE ROBERT W. WOOLDRIDGE, JR.

This matter came before me for trial on Complainant's Petition for Relief Pursuant to § 15.1-303 of the Code of Virginia and Motion for a Declaratory Judgment. Following the trial, I took all matters under advisement.

Mason Neck is a unique, environmentally sensitive peninsula along the eastern border of Fairfax County. It is largely undeveloped. Fifty-five hundred of its 9,000 acres are public park land. Another 1,400 acres comprise agricultural and forest districts. The developable portion of Mason Neck is zoned Rural Estate (RE), presently requiring two to ten acres per dwelling.

Gunston/Wiley is a subdivision formed in the late 1940s and early 1950s in the Mason Neck area. Gunston/Wiley is comprised of 135 lots, each averaging just over half an acre in size. Of the seventy-seven developed lots in Gunston/Wiley, seventy-four are served by septic tanks. The remaining three are served by pit privies. Handling sewage by septic tanks and pit

privies, particularly in an area with poor soils, has, not surprisingly, become a health hazard. By the early 1990s, thirty of the seventy-four lots served by septic tanks were class one failures, constituting immediate health hazards. Twenty of the lots served by septic tanks were class two failures, meaning they were consistently problematic and verging on an immediate health hazard. Those substandard conditions had significantly increased in the preceding five years. Public sewer lines had not been extended to the Gunston/Wiley subdivision.

The complainant, Howard S. Schwartz, inherited twenty-one lots in Gunston/Wiley from his father in the mid- and late-1960s. Schwartz never developed the lots because their soils were so poor that they would not accommodate either septic tanks or pit privies. Schwartz continued to hold the lots in anticipation that public sewer lines would one day be extended to the subdivision.

Throughout the early 1990s, the Board of Supervisors of Fairfax County (the Board) often took up Gunston/Wiley sewer problems at its meetings and directed its staff to make certain investigations. In April 1993 the Board allocated $125,000 to the process of finding a remedy for the Gunston/Wiley sewer problem. In August 1993, the Board directed County staff to continue their efforts to find a solution. In March 1994, the Board created the Wiley/Gunston Heights Conservation area.

On June 27, 1994, the Board approved an amendment to the Fairfax County Comprehensive Plan. The Board also approved the expansion of the Approved Sewer Service Area (ASSA) to include portions of the Gunston/Wiley subdivision. Finally, the Board authorized its staff to award a contract for design services associated with the Gunston/Wiley pump and haul sewer system to the engineering firm of Patton, Harris, Rust and Associates.

The ASSA amendment's stated purpose was to "eliminate the public health hazards associated with failing, inadequate sewage disposal systems, and to provide a safe and adequate sewage disposal system to serve existing homes in the Wiley-Gunston Heights Conservation Area." Amendment No. 92-31 to the Comprehensive Plan, Complainant's Ex. 36. Accordingly, the amendment imposed certain conditions upon connection. First, only lots that were developed as of March 21, 1994, and that were experiencing septic failure could reserve a sewer connection. Second, the landowner had to agree to install water conservation devices. Third, the landowner had to enter into a restrictive covenant in which he agreed not to expand his dwelling to add new bedrooms. The Board later rescinded the second and third conditions.

Because they were undeveloped, Schwartz's lots were not included in the expanded ASSA. Within thirty days of the Board's June 27, 1994, actions,

Schwartz filed his petition in the instant proceeding. In Count I he alleges that on June 27, 1994, the Board established and maintained, or caused to be established and maintained, a public sewer for the purpose of protecting public health to which he, as owner of adjacent land, has the right to connect under § 15.1-300. Having been deprived of that right, he appeals the Board's actions under § 15.1-303.[1] Alternatively, Schwartz contends in Count II that the Board's actions have deprived him of his Fifth and Fourteenth Amendment substantive due process and equal protection rights and that he is therefore entitled to recover under 42 U.S.C. § 1983.

*Count I*

Section 15.1-300 of the Virginia Code was repealed in December of 1997. This section provided:

> The governing body of any county may establish and maintain, or cause to be established and maintained, public sewers and public water mains along the streets, alleys and public highways in any incorporated town, village or suburbs of any city when the same shall be necessary, whether the title to such streets, alleys and public highways be vested in the governing body or not, to protect the public health. The owners of adjacent lands shall have the right to connect their premises with such sewers and water mains on such terms as the governing body shall prescribe.

Schwartz argues that, if the Board acted under § 15.1-300, its June 27, 1994, approval of the amendment of the Comprehensive Plan and the expansion of the ASSA, was a "final action." Under § 15.1-303, a person may appeal a final action of the Board to the Circuit Court within thirty days. Schwartz argues that no other sections of the Virginia Code in existence in 1994 allowed the Board to impose non-monetary conditions upon lot owners seeking sewer connection. Therefore, if the Board acted under any other section of the Code in approving the amendment to the Comprehensive Plan and the expansion of the ASSA, the Board's decision to allow only lots with existing dwelling units to reserve connection to the sewer was *ultra vires* and thus unenforceable.

---

[1] Chapter 9, Article 1, of the Virginia Code, which includes §§ 15.1-292 to 15.1-362, was repealed in December 1997. No successor sections were enacted in place of § 15.1-300 or § 15.1-303.

The County argues that its decisions of June 27, 1994, were not final actions, but rather the first steps toward the "establishment" of a sewer under §§ 15.1-320 and 15.1-292. Therefore, because the Board had not yet taken the final action of "establishing" the sewer, Schwartz's claims are not ripe for adjudication.

Even if the Board was acting under § 15.1-300, I find that the Board's actions on June 27, 1994, were not final actions. A Comprehensive Plan "is general in nature and serves as a guide for the coordinated development of the territory." *Town of Jonesville v. Powell Valley Village Limited Partnership*, 254 Va. 70, 75, 487 S.E.2d 207 (1997). Therefore, adoption of such a plan does not "establish" a sewer system. Furthermore, the expansion of the ASSA merely permitted the future construction of a pump-haul sewer system in Gunston/Wiley; it did not amount to the establishment of a sewer system under § 15.1-300. Section 15.1-300 permits the establishment and *maintenance* of a sewer system. This language suggests that § 15.1-300 refers to the physical construction of a sewer system, and that, until such a system is constructed, § 15.1-303 cannot be invoked. The Board's actions of June 27, 1994, did not *require* it to construct a sewer.

Because the Board's June 27, 1994, actions did not result in the establishment of a sewer, the Board's actions were not "final" and therefore not appealable to this court under § 15.1-303. Accordingly, Count I is dismissed.

*Count II*

The Motion for Declaratory Judgment seeks (1) a declaration that the actions of the Board on June 27, 1994, were arbitrary, capricious, and unlawful and (2) damages under 42 U.S.C. § 1983. Section 1983 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state [or] county . . . subjects or causes to be subjected, any citizen of the U.S. or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured at an action at law, suit in equity, or other proper proceeding of redress.

42 U.S.C. § 1983. In order to recover from the County under this statute, Schwartz must prove that the Board enacted an official policy that was

unconstitutional or that the Board deprived him of a Constitutional right pursuant to a "custom or usage" that had not received formal approval through the Board's official decision-making channels. See *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690-91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). Schwartz argues that the conditions the County placed on sewer connection by adopting the amendment to the Comprehensive Plan on June 27, 1994, violate his substantive due process and equal protection rights. Schwartz further argues that this Court cannot compel the Board to permit Schwartz to reserve sewer connections, but that if the Board continues to deny him sewer connections, he is entitled to damages and attorney's fees under § 1983.

### Substantive Due Process

To establish a claim that the Board has violated his substantive due process rights, Schwartz must show (1) that he had a property interest, (2) that the state deprived him of his property interest, and (3) that the state's action "falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Sylvia Devel. Corp. v. Calvert County, Maryland*, 48 F.3d 810, 827 (1995).

Schwartz has a "cognizable" property interest if he has a "legitimate claim of entitlement" to reserve sewer availability and connections to the public sewer system serving Gunston-Wiley. See *Board of Regents v. Roth*, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).

> Whether a property-holder possesses a legitimate claim of entitlement . . . to a permit or approval turns on whether, under state and municipal law, the local agency lacks all discretion to deny issuance of the permit or withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest . . . . Under this standard, a cognizable property interest exists only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured.

*Gardner v. Baltimore Mayor*, 969 F.2d 63, 68 (4th Cir. 1992). Thus the court must examine whether the Board's decision regarding the type of property owners permitted to connect to the ASSA was ministerial or legislative, that is, whether the Board was performing a proprietary or a discretionary function in extending sewer service to Gunston/Wiley.

*Gardner* did not involve a public utility, but rather the Baltimore City Planning Commission's regulation of residential development in a subdivision. In *Gardner*, the complainant argued that, while the creation of a Development Plan is discretionary, decisions regarding whether a property owner's intended use of his land complies with the Development Plan is ministerial. The court rejected this argument, holding that the Planning Commission's role was discretionary and that the property owner therefore had no cognizable property interest. The court relied on the Subdivision Regulation, which specifically allowed the Planning Commission to examine plans submitted by land owners and to enforce additional requirements. The court distinguished *Gardner* from *Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983), which held that a developer had a cognizable property interest in obtaining a permit for construction of low-income housing. The court noted that in *Scott*, the county's actions were purely ministerial because state law (in that case, South Carolina law) required the county to issue a building permit to any applicant whose intended use was permitted under the relevant zoning ordinance. Because the municipal authorities in *Scott* "lacked all discretion to deny issuance of the permit," the landowner possessed a legitimate claim of entitlement and thus a valid property interest. *Gardner* at 69.

Schwartz concedes that the Board's decision to extend sewer service to Gunston-Wiley was legislative, but argues that, once the Board did so, any subsequent determinations regarding the *manner and scope* of connection were ministerial decisions. Schwartz points to Va. Code § 15.1-300,[2] which provides "the owners of adjacent lands shall have the right to connect their premises with such sewers and water mains on such terms as the governing body may prescribe."

Schwartz further argues that he is not only *entitled* to connect to the public sewer under Va. Code § 15.1-300, but that he is *compelled* to connect by the Fairfax County Code, which provides that property owners must connect any structures built on their land to available sewer lines. See Fairfax County Code, §§ 65-7-7 and 65-7-6. For a single-family dwelling (which Schwartz wants to build), "[a] sanitary main shall be deemed available when the main is within . . . three hundred feet of a property line." Fairfax County Code § 65-7-7. Schwartz argues that the paradox presented by this situation (that he is compelled to connect under the Fairfax County Code, but forbidden to connect by the Board's terms of connection) suggests that the legislature's intent in drafting § 15.1-300 was to create a protectable property interest.

---

[2]  This section was repealed in 1997. However, it was in place on July 26, 1994, when Schwartz filed a Petition for Relief under § 15.1-300 (later nonsuited).

This argument is unpersuasive for two reasons. First, the sections only mandate the connection of *buildings* to the sewer. No buildings exist on any of Schwartz's lots, and the County Code does not compel him to build any. Second, to the extent that general provisions of the County Code conflict with the County's comprehensive sewer plan for a specific area, the comprehensive sewer plan supersedes the general code section. See *Beard Plumbing & Heating v. Thompson Plastics*, 254 Va. 240, 245, 491 S.E.2d 731 (1997) (It is a general rule of statutory construction that "if one section addresses a subject in a general way and the other section speaks to a part of the same subject in a more specific manner, the latter prevails.").

The actual operation of a sewer system and method of construction of the system is proprietary in nature, and therefore governed by the same rules that control a private business or individual. See *Whitehead v. H and C Devel. Corp.*, 204 Va. 144, 150, 129 S.E.2d 691 (1963). However, the establishment of the system itself involves issues of public policy and is therefore legislative in character. See *id.* at 151. The decision to extend a sewer system to a new area is similarly legislative. See *NV Land v. Board of Supervisors*, Ch. No. 105959 (Fairfax County Cir. Ct., 1990) (Jamborsky, J.); see also *Carver v. Spotsylvania County Supervisors*, 12 Va. Cir. 94, 96 (Spotsylvania County 1987) (Ledbetter, J.); see also *Byrd v. Martin, Hopkins, Lemon and Carter*, 564 F. Supp. 1425 (1983) (holding that decisions regarding the adoption and construction, and extension of a sewer system are discretionary, while the operation and maintenance of a sewer is a ministerial function). Imposition of the condition that all lots entitled to reserve connection to a sewer that may be built in the future have dwellings on them as of March of 1994 was an exercise of the Board's discretionary authority to determine whether to extend sewer service to Gunston/Wiley.

Schwartz contends that, even if the Board's refusal to allow undeveloped lots to reserve sewer connection was a proper exercise of the Board's discretionary authority, the "holding out" doctrine requires sewer availability to be provided equally. This doctrine provides that a municipal corporation that holds itself out as providing sewer services to an area outside its territorial limits should be treated as a public utility and therefore may deny service to properties within that area only for "utility-based" reasons, such as lack of capacity. See *Town of Rocky Mount v. Wenco of Danville*, 256 Va. 316, 321, 506 S.E.2d 17 (1998). The Supreme Court of Virginia has not held whether the holding out doctrine is recognized in Virginia.

Even if the holding out doctrine were recognized in Virginia, it would not apply in this case. Other jurisdictions that have adopted the doctrine have done so in situations in which the county or municipality has agreed to provide

sewer services to areas outside its territorial limits. See e.g. *Delmarva Enterprises, Inc. v. Mayor and Council of Dover*, 282 A.2d 601 (Del. 1971); *Yakima County Fire Protection Dist. No. 12 v. City of Yakima*, 122 Wash. 2d 371, 858 P.2d 245 (1993); *Milwaukee v. Public Service Comm'n*, 268 Wis. 116, 66 N.W.2d 716 (1954). The Gunston/Wiley subdivision is located within Fairfax County. Thus, the justification for the doctrine, that a county or municipality that agrees, by contract, to provide services to an *area to which it otherwise owes no duty* must do so for all such properties absent a utility-based reason, is not present in this case. See 11 McQuillan, *Municipal Corporations*, § 31.10 (3d ed., 1991 and 1997 Supp.) ("Provision by a municipality of sewer service to nonresidents is a proprietary function, since the municipality is under no duty, except contractual, to furnish any service to nonresidents.")

Because I find that Schwartz does not have a legitimate claim of entitlement to the reservation of sewer connection for his undeveloped lots, it is unnecessary to examine the second and third elements of the substantive due process analysis.

### *Equal Protection*

Schwartz argues that the County's refusal to allow him to reserve sewer connections results from an improper classification between property owners whose lots were developed as of March 21, 1994, and property owners whose lots were not developed as of that date. The County argues that Schwartz is not similarly situated to the property owners who are permitted to connect to the ASSA because his lots do not present a health hazard. See Resp. Post-trial Memo at 8. The County argues that even owners of developed lots that do not pose a health hazard would not be permitted to connect to the ASSA. In support of this argument, the County relies on a June 27, 1994, Board Summary of the Expansion of the ASSA to Permit the Construction of the Pump-Haul System. The Summary states that the following lots are required to connect to the system: (1) all dwelling units constructed before March 21, 1994, that have privies, (2) all dwelling units constructed before March 21, 1994, that have failing septic systems, (3) all existing dwelling units constructed before March 21, 1994, that experience septic system failures at a later date. See Comp. Ex. 37, at 54. Although this summary outlines which lot owners would be *required* to connect to the sewer, it does not address which lot owners would be *permitted* to connect.

The parties agree that the County amended the Comprehensive Plan in order to address the public health hazard posed by a high concentration of pit

privies and failing septic systems in the Gunston-Wiley subdivision.[3] Protecting the health and safety of citizens is a legitimate governmental interest. See *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996). Because Schwartz is not a member of a suspect class, the County may treat him differently from other property owners as long as the County's objective is legitimate, the classification bears a reasonable or substantial relation to the objective, and the County's actions are neither arbitrary nor discriminatory. See *Duke v. County of Pulaski*, 219 Va. 428, 432, 247 S.E.2d 824 (1978). Where a classification is not based upon religion, race, color, sex, or national origin, "the classification will not be held to be unconstitutional merely because it results in some inequality or some discrimination." *Id.* citing *Dandridge v. Williams*, 397 U.S. 471, 485, 25 L. Ed. 2d 491, 90 S. Ct. 1153 (1970).

In this case, the Board draws a distinction between lots with existing dwellings that are causing or may cause septic problems and those lots that are undeveloped and therefore pose no risk of septic failure, either now or in the future. The Board's distinction is admittedly troubling. The Board later eliminated the second condition it imposed on June 27, 1994, which required owners of property with existing dwellings not to add additional bedrooms onto their houses. Furthermore, I find from the testimony at trial that existing land use and utility provisions would allow the owner of an existing dwelling to purchase an adjoining, undeveloped lot and expand his house onto it. Both of those factors have the potential of increasing the demand on the sewer system. The undeveloped lot owner, on the other hand, is not permitted to effect the same increase by building on his lot and tapping into the system.

---

[3]  In a June 13, 1994, Memorandum to the Board, James P. Zook, director of the Office of Comprehensive Planning, quoted portions of the Comprehensive Plan. These portions indicate the County's concern that extension of a public sewer to Gunston/Wiley would "cause significant disruption to the stream valleys and would be contrary to the need to preserve the environmental integrity of the areas of habitat to further the existence of rare species of plants, birds and animals." In his Memorandum to the Board, Zook recommended that the pump-haul system ultimately adopted by the County would correct the existing hazard without hindering "important overall land use and public facility objectives." Schwartz does not argue that this secondary goal is impermissible, but rather argues that the County could maintain the rural character of Mason Neck even if he were permitted to connect his lots to the sewer. I find that the evidence presented at trial supports the County's position that its decision to deny connection to undeveloped lots is rationally related to both the correction of the health hazard and the preservation of the Mason Neck environment.

Although the outcome is inequitable, I cannot find that the County's classification of lots eligible for sewer service bears no reasonable or substantial relation to the objective of addressing the public health hazard or that it is arbitrary or discriminatory.

I am not persuaded that the County's earlier provision of sewer service to the Lincoln-Lewis-Vannoy, Jermantown Road, and Lehigh Village subdivisions is a basis for any equal protection claim by Schwartz. In light of the unique environmental character of Gunston/Wiley and its geographic separation from the existing sewer service area, the Board's decision to implement a pump-haul system and to deny sewer connection to undeveloped lots was reasonable and rational.

Because the Board's June 27, 1994, decision to allow only lots with existing dwelling units to reserve connection to the ASSA does not violate Schwartz's substantive due process or equal protection rights, Schwartz is not entitled to damages under 42 U.S.C. § 1983.